Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| SUSAN W. and A.W., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE and UNITED BEHAVIORAL HEALTH, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 1:23-cv-00027-DBP <br><br> Judge <br><br> Magistrate Judge Dustin B. Pead |

**COME NOW** Susan W. and A.W., collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Susan W. ("Susan") is a natural persons residing in La Plata County, Colorado. She is covered by a fully insured plan provided by Susan's employer through United Healthcare ("UHC") and United Behavioral Health ("UBH").

2. Plaintiff A.W. is a resident of La Plata County, Colorado. As a beneficiary of her mother's health insurance plan, she received treatment at Elevations Residential Treatment Center

1

("Elevations"), a licensed residential treatment facility in Syracuse, Utah from January 29, 2019 through June 3, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the treatment took place in the State of Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of A.W.'s denied claims from February 14, 2019 through June 3, 2019 for treatment rendered at Elevations, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs seek injunctive relief pursuant to 29 U.S.C. §1132(a)(3) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

7. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

8. A.W. was adopted at birth by Susan and her late husband, Paul.

9. A.W. was born prematurely, weighing only 3 pounds and 10 ounecs, and had to spend 10 days in the newborn intensive care unit.

10. When A.W. reached school age, she was placed in a private school where she would remain until seventh grade. In the second grade, A.W. started struggling immensely. She fell behind her peers and couldn't keep up, much to the concern of her teachers.

11. A.W. was diagnosed with attention-deficit hyperactivity disorder ("ADHD") and started taking medication to help manage her symptoms. Due to the medication, A.W. began gaining weight at an alarming rate and couldn't control her appetite.

12. In fourth grade, A.W. began to be bullied by her peers due to her weight and odd behaviors. The only extra support she received was from her mother, who was a teacher at the school A.W. attended.

13. In seventh grade, September of 2014, A.W. was moved to a public school to get her out of the bullying environment, but a lot of her private school peers were also moved to public school at this time and the tormenting continued. A.W. began to cut to cope with the bullying.

14. Susan and A.W. moved to Colorado for a fresh start for A.W. She also began to see an outpatient psychiatrist for medication management.

15. In August of 2016, A.W. began her ninth grade year and had issues almost immediately. In September of 2016, she attempted suicide for the first time.

16. In December of 2016, A.W.'s father, Paul, was lifelighted to the hospital. In the coming weeks, he would be diagnosed with an inoperable brain tumor that shortened his life expentancy to three to six months. A.W. did not take well to this news at all and began experiencing panic attacks.

17. Soon after this, A.W. stopped attending school regularly and hid in her room.

18. Throughout 2017, Paul's condition worsened and it affected A.W. greatly. Paul suffered from dementia and would wander the house for hours and knock on A.W.'s door incessantly. He would take off his clothes because his temperature would become unregulated and he wasn't aware he was in front of other people. A.W. watched her father slowly die in front of her as the tumor also made him lose his mind.

19. She was increasingly depressed, anxious, heartbroken and frustrated, and went so far as to threaten to kill her father in his sleep. She was placed on antipsychotic medications due to this incident.

20. By April of 2018, Paul's condition had declined so severely that he was placed in the local hospice center. On April 24, 2018, Paul lost his battle against the tumor and passed away.

21. A.W.'s school decided not to hold her back a grade due to the trauma she had experienced over the last school year. However, soon after the beginning of the new school year, A.W. returned to old, self-defeating habits and began to hide in her room and refuse to attend school entirely.

22. In December of 2018, A.W. advised Susan that she had been saving up her Prozac to attempt suicide. She had taken seven or eight pills and decided she did not want to die. Susan called A.W.'s doctor immediately.

23. A.W.'s doctor strongly recommended that she needed sustained residential treatment in order to address her issues.

24. A.W. was admitted to Elevations on January 29, 2019.

**PRE-LITIGATION PROCESS FOR A.W.'S TREATMENT AT ELEVATIONS**

25. Claims were submitted to UBH by the Plaintiffs for A.W.'s treatment at Elevations.

26. On February 15, 2019, UBH sent a letter denying A.W.'s treatment as not medically necessary. The denial letter stated, in part:

> Your child was admitted for treatment related to her behavior and mood. After reviewing the available information, it is noted your child has made progress and that your child's condition no longer meets Guidelines for further coverage of treatment in this setting. Specifically, she has been participating in groups and activities. Although she continues to appear depressed, she does not appear to be at imminent risk for danger to herself or others. Her recovery could continue at a lower level of care.
>
> Your child could continue care in the Mental Health Partial Hospitalization Program setting with medication, therapy, family and community support.

27. On August 7, 2019, the family submitted a Level One Member Appeal. This appeal was incorrectly processed as a provider appeal.

4

28. In the appeal, Plaintiffs outlined that they had certain rights under ERISA, such as (1) a full, fair, and thorough review; (2) all comments, documents, records, and other information relating to their claim; (3) the identification and credentials of any medical or vocational expert whose advised was obtained in connection with their claim (even if their advice was not relied upon in making the adverse decision); and (4) a description of any additional material or information necessary for the family to perfect their claim along with an explanation of why such information is necessary. Susan advised UBH that is was imperative they complied with ERISA regulations.

29. Susan went on to outline that she had followed UBH's instructions on how to obtain a copy of the clinical guidelines used to deny A.W.'s treatment and she was concerned that guidelines put into place after A.W.'s admission to Elevations were being used to evaluate the medical necessity of her treatment.

30. Susan also advised it was a violation of generally accepted standards of medical practice to require patients to exhibit acute psychiatric symptomology to receive sub-acute/intermediate care.

31. Plaintiffs further outlined that A.W.'s treatment at Elevations is an analogous level of care to their intermediate medical health benefits, such as skilled nursing facility services or rehabiliatative services.

32. The family went on to outline that UBH was not applying a similar treatment limitation to mental health and substance use disorder benefits as they were to medical health benefits by denying A.W.'s claims due to restrictions that did not appear to apply to medical or surgical benefits at the same level, creating a nonquantitative treatment limitation ("NQTL"). Specifically, Plaintiffs outlined that UBH may be imposing a NQTL based on requiring mental

health and substance use disorder patients to exhibit acute symptoms to qualify for sub-acute/intermediate treatment but not requiring the same of medical or surgical patients.

33. The family included letters of medical necessity in the appeal as well as medical records to prove that A.W.'s treatment was medically necessary to treat her conditions.

34. Plaintiffs concluded by requesting that UBH take all this information into account when reviewing the appeal. Plaintiffs also asked that, in the case of an adverse benefit determination, UBH provide them a copy of all the documents under which the Plan is operated, the clinical guidelines or medical necessity guidelines utilized, and requested the mental health and substance used disorder medical necessity guidelines as well as the analogous medical and surgical medical necessity guidelines.

35. In a letter dated September 11, 2019, UBH upheld their denial. The denial letter stated, in part:

> Taking into consideration the available information and the locally available clinical services, it is my decision that the requested service did not meet the Optum Level of Care Guideline required to be followed in the member's behavioral health plan benefits. Specifically: The member's clinical condition appeared to have improved and stabilized, to the extent that she no longer required a residential level of care. The member was not experiencing serious signs and symptoms, or significant psychosocial or environmental issues that prevented treatment in a less intensive setting such as Mental Health Services Partial Hospitalization Program. There was no active suicidal ideation, no homicidal ideation, no psychosis, no medical instability, no withdrawal symptoms. She was not aggressive towards others. She was not having medication side effects or showing acute impairment of behavior or cognition requiring a residential level of care. Criteria for ongoing treatment requires there is a reasonable expectation of improvement in a reasonable period of time, which was not the case. She had long term MH issues which could have been managed at a lower level of care such as Mental Health Services Partial Hospitlization Program.

36. The family submitted a Level Two Member Appeal on October 21, 2019.

37. The family outlined in the appeal that, once again, UBH was in violation of their fiduciary duties under ERISA. The family stated that they had certain rights under ERISA, such as (1) a full, fair, and thorough review; (2) all comments, documents, records, and other information relating to their claim; (3) the specific reasons for the adverse determination including any specific plan provisions, medical criteria, and other documents utilized in making said determination; (4) the identification and credentials of any medical or vocational expert whose advised was obtained in connection with their claim (even if their advice was not relied upon in making the adverse decision); (5) a description of any additional material or information necessary for the family to perfect their claim along with an explanation of why such information is necessary. UBH did not provide this information when it was requested in the Level One Member Appeal.

38. Plaintiffs reiterated their arguments from their Level One Member Appeal, including the appeal and all of its exhibits as an exibit to the Level Two Member Appeal.

39. Plaintiffs also submitted a Complaint to the Department of Insurance outlining UBH's handling of A.W.'s claims so far.

40. In a letter dated March 6, 2020, UBH upheld their denial and issued a final adverse determination, stating, in part:

> A doctor review your child's appeal. The treatment requested was not medically necessary. We based this decision on the information we received and the Optum guidelines for the Mental Health Residential Treatment Center. She was not having any suicidal thoughts. She did not have thoughts to harm others and was not aggressive. She was medically stable. She did not require the level of supervision provided in a residential facility. She was able to participate in programming and was adherent with her medications. She had support from her family. The available information does not support her needing 24 hour supervision and care in a residential facility.

41. The family exhausted their appeal rights with UBH.

## FIRST CAUSES OF ACTION

### (Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)) and Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a))

42. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

43. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

44. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for A.W.'s claim denial, written in a manner calculated to be understood by the family; 2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the A.W.'s claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

## SECOND CAUSE OF ACTION

### (Claim for Violation of the Parity Act Under 29 U.S.C. §1132(a)(3))

45. The Parity Act is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the Parity Act.

46. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

47. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

48. Impermissible nonquantitative treatment limitations under the Parity Act include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

49. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan restricted for A.W.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner the Plan restricted coverage of treatment for A.W. at Elevations.

50. Specifically, the Plan's reviewers utilized internal processes and procedures that may have placed a limitation on the scope of services available for intermediate behavioral health

care, while not limiting the scope of services available for intermediate medical or surgical benefits.

51. When the Plan receives claims for intermediate-level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. The Plan evaluated A.W.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

52. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

53. The violations of the Parity Act by the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

54. A declaration that the actions of the Defendants violate the Parity Act;

55. An injunction ordering the Defendants to cease violating the Parity Act and requiring compliance with the statute;

56. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the Parity Act;

57. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of the Parity Act;

58. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of the Parity Act;

59. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

60. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of the Parity Act; and

61. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of the Parity Act.

62. 45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A.

63. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

## **RELIEF**

64. WHEREFORE, the Plaintiffs seek relief as follows:

65. Judgment in the total amount that is owed for A.W.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

66. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

67. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

68. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 6th day of March, 2023.

                                        G. ERIC NIELSON & ASSOCIATES

                                        */s/ Laura Nielson*
                                        Laura Nielson
                                        *Attorney for Plaintiffs*